## UNITED STATES DISTRICT COURT
## OF THE MIDDLE DISTRICT OF FLORIDA

### Case No.: _____

HALEY BARTLETT,

     Plaintiff,

v.

DUVAL COUNTY PUBLIC SCHOOLS,

     Defendant.

_____/

### COMPLAINT FOR DAMAGES, EQUITABLE RELIEF AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, HALEY BARTLETT, by and through her undersigned counsel, and files this Complaint for Damages and Equitable Relief against DUVAL COUNTY PUBLIC SCHOOLS ("DCPS"), and alleges as follows:

### JURISDICTION AND VENUE

1. Plaintiff brings this suit pursuant to 42 U.S.C. § 1983, seeking damages, declaratory and injunctive relief against the Defendant for its violation of Plaintiff's First and Fourteenth Amendment rights.

2. 42 U.S.C. § 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person

within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

3.     42    U.S.C. § 1983 permits the recovery of damages—that is, monetary relief—against a state or local official whose conduct results in a deprivation of rights "secured by the Constitution."

4.     This action further seeks a judicial determination of issues, rights, and liabilities embodied in an actual and present controversy between the parties involving the constitutionality of certain policies and practices of Defendant and its leadership (including but not limited to school board members wearing partisan clothing on the dais while doing DCPS business, elevating one side of political speech over another, allowing extra time to a preferred viewpoint, allowing extra protection or rule breaking based on viewpoint, calling speakers evil and violent while calling others martyrs or brave and more).

5.     There are additional substantial *bona fide* doubts, disputes, and questions that must be resolved concerning Defendant's actions taken under color and authority of state law and procedures, in violation of Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution.

6.     This Complaint seeks damages, declaratory and injunctive relief to prevent further violations of the Plaintiff's rights, privileges, and immunities under

the Constitution of the United States and 42 U.S.C. §1983 and §1988, specifically seeking redress for the deprivation under color of state statute, ordinance, regulation, custom or usage of rights, privileges, and immunities secured by the Constitution and laws of the United States. The rights sought to be protected in this cause of action arise and are secured under the First and Fourteenth Amendments to the Constitution.

7.     The Court has the authority to issue declaratory judgments and permanent injunctions pursuant to 28 U.S.C. § 2201 and §2202, and Rule 65 of the Federal Rules of Civil Procedure.

8.     The Court may enter an award of attorney's fees pursuant to 42 U.S.C. § 1988.

9.     Venue is proper in the Northern District of Florida, Jacksonville Division, since all parties are situated in Jacksonville, and all of the actions complained of occurred within the district and geographical area assigned to the Jacksonville Division.

## **THE PARTIES**

10.     At all material times, Plaintiff, Haley Bartlett, was / is an educator in Duval County, Florida.

11.     The Plaintiff is/was employed as a paraprofessional at Oakhill Academy, a Duval County Public School, in Jacksonville, Florida.

12.     According to the Defendant's own website, "Oak Hill Academy is a nurturing environment created for students with autism spectrum disorders and related disabilities. It provides a unique educational experience that offers customized, intensive, and effective instruction to meet the individual needs of each student."

13.     Further, the Defendant notes, "The dedicated staff at Oak Hill Academy motivates and assists every learner in achieving their objectives by employing interactive curricula, technology, and research-supported teaching methods and interventions."

14.     Defendant is the Duval County Public Schools, which operates the school system in Jacksonville, Duval County, Florida. It is run by a 7-member school board.

15.     All actions occurred within Jacksonville, Duval County, Florida.

## COLOR OF STATE LAW

16.     The Defendant herein is compromised of public officials and officials of a state agency and at all material times were / are acting under color of state law and authority.

17.     Defendant's actions, taken under color of state law, violate Plaintiff's constitutional rights.

## HALEY BARTLETT

18.     The Plaintiff is a paraeducator at Oak Hill Academy, a Duval County Public School, in Jacksonville, Florida. She holds a teaching certificate with the State of Florida.

19.     Since the actions which led to her reassignment, Ms. Bartlett has been reassigned and is away from her students, and all students, while being basically held essentially in solitary confinement first at Bull's Bay and then in Duval County Public School's main office.

20.     Ms. Bartlett provided a nurturing environment to her students, who exhibited an array of autism spectrum disorders and related disabilities, some of them quite significant and disabling.

21.     This was a special job for Ms. Bartlett. She loved her students and taught them how to live in a world which is more challenging than it is for other similarly aged children.

22.     Further, the Defendant notes, "The dedicated staff at Oak Hill Academy motivates and assists every learner in achieving their objectives by employing interactive curricula, technology, and research-supported teaching methods and interventions."

23.     Ms. Bartlett's tasks often included cleaning up after her students in ways many educators and paraeducators would find difficult, but she always did it with compassion and love.

24.     Some of Bartlett's students were particularly attached to her and have demonstrated significant difficulty with her absence in the classroom. In one example, a student had to leave and receive intensive treatment after the involuntary removal of Ms. Bartlett.

25.     Haley Bartlett was unfairly targeted as part of a larger campaign which targeted similarly situated teachers across the county over protected speech found disagreeable to certain political and government "leaders," including the majority of Duval County Public School's School Board.

26.     Ms. Bartlett did not even speak. She merely re-posted someone else's political speech on her own time on her own device on her own personal social media (TikTok), which subjected her to persecution by Defendant.

27.     Ms. Bartlett did not post statements of her own, but regardless these statements were in no way affiliated with her job as a paraeducator.

28.     Ms. Bartlett never brought politics or political opinion into the classroom.

29.     Further, under Florida law, the children Ms. Bartlett taught were not allowed to see and engage in the social media Ms. Bartlett used, as to do so would have violated state law.

30.     Finally, Ms. Bartlett's classroom was unlike other classrooms where political speech and debate could be part of an occasional curriculum. It was never even a topic of incidental debate.

31.     Ms. Bartlett has never promoted her social media to students or parents and is not in any way a public figure.

32.     Ms. Bartlett is / was one of many educators across Florida who were persecuted solely for the content of their speech.

33.     Ms. Bartlett has been on administrative leave and unable to teach or assist her students for several months.

34.     Ms. Bartlett was not removed from class or disciplined for anything which happened in a classroom, on school property or using school resources. Instead, DCPS publicly disciplined her solely because she boosted someone else's non-inflammatory speech, which led to an anonymous complaint.

35.     Ms. Bartlett has been told nothing about her Complaint, her complainant or the status of any investigation. She just sits in a room punching holes in paper or doing a number of isolating and depressing tasks.

36.     Duval County Public Schools and the Florida Department of Education refuse to respond to requests for any and all complaints or supporting information which led these types of investigations.

37.    Stated alternatively, there is no known student of Ms. Bartlett who claims, or has claimed, they were harmed or subjected to improper speech, thought or action in any way.

38.    There is no improper conduct, victimization, crime or allegation on wrongdoing in any classroom or schoolhouse whatsoever.

39.    Ms. Bartlett has been removed from her classroom and school for months and placed into isolation for hours a day as punishment as a result of a political debate where an unknown complainant felt offended.

40.    Ms. Bartlett has been suspended and faces revocation of her ability to educate as a spoil of those who are told to complaint to remove teachers who do not politically align with their family's values.

## **CHARLIE KIRK**

41.    This lawsuit (and ones like it) stem from the aftermath of the tragic shooting of Charles James "Charlie" Kirk (hereinafter, "Mr. Kirk" or "Kirk").

42.    Mr. Kirk was born on October 14, 1993. Until his death on September 10, 2025, Kirk was known as a political activist, entrepreneur, and media personality.

43.    Kirk co-founded the conservative student organization Turning Point USA (hereinafter, "TPUSA") in 2012 and published a range of very right-leaning books and hosted the podcast *The Charlie Kirk Show*.

44.    Kirk also hosted a question-and-answer tour across America where moderators would choose people out of the audience to debate Kirk, often leading to viral moments posted to the internet.

45.    Based largely on campus tour clips and podcast excerpts, Kirk rose to prominence, particularly in the Republican Party. Mr. Kirk was unquestionably a political figure, celebrity and sought out and platformed divisive stances which led to tremendous fame.

46.    Kirk's publications platformed sensational and divisive statements, which put many Americans at odds with each other. Many Americans were cast off as evil or seeking war, while others are told they must fight for their lives and religious salvation at any and all cost.

47.    Kirk even addressed the correlation of violence and political speech, saying, "I think it's worth it to have a cost of, unfortunately, some gun deaths every single year so that we can have the second amendment to protect our other God-given rights. That is a prudent deal. It is rational." This was said at an event organized by TPUSA Faith, the religious arm of Kirk's conservative group Turning Point USA, on April 5, 2023.

48.    After Kirk's death, some praised him. Others posted clips and took more disagreeable stances.

## CHARLIE KIRK: A MATTER OF PUBLIC CONCERN

49.    After his assassination, many Americans were outraged that Kirk was receiving praise without mention of his controversial, if not discriminatory, statements.

50.    Some wanted to censure all criticism of Charlie Kirk out of respect for his life. Others felt a personal obligation to keep his statements in a proper context which they felt was being manipulated or ignored. This is all protected speech. The pendulum of the First Amendment protects both sides.

51.    Many of the criticisms and contextualization were about Kirk's public statements on race. About African Americans, Kirk used statements like, "(P)rowling Blacks go around for fun to go target white people, that's a fact. It's happening more often."

52.    Also, on *The Charlie Kirk Show,* on May 19, 2023, Kirk used racially triggering and inciteful words like, "thugs," and said repeatedly he wanted to see an end to, "a pattern of blacks prowling the streets… (who) feel untouchable."

53.    Kirk explained, "social justice warrior simulation theory" in such an inflammatory way as to blame those who seek justice as conditioning Americans to, "take the black person's side over the white person."

54.     At one point on the May 19, 2023, edition of *The Charlie Kirk Show,* Kirk feigned surprise by a statistic cited by his producer, but then emphasized the information, saying, "more than 600 white women a year are murdered by black men." These stats have been highly criticized by media.[1] All too often, no source was cited for the statistics Mr. Kirk used to engage and enrage.

55.     Other controversial rants by Kirk include statements like, "MLK was awful. He's not a good person." And, "If I see a Black pilot, I'm going to be like, boy, I hope he's qualified." And, "If I'm dealing with somebody in customer service who's a moronic Black woman, I wonder is she there because of her excellence, or is she there because of affirmative action?"

56.     Kirk further noted an example involving a Hispanic man murdering a white woman and noted it didn't fit his rant, so he added, "well, he might have been half-black." He then noted the assailant was, "trans." This seems to be referring to the murder of Lauren Heike, who was allegedly murdered by Zion William Teasley. Teasley's trial will not occur for years and discovery in the case has not been made public. Social media has leaked false details, as it does daily. The Arrest Report and Criminal Indictment note Teasley served in the military, had a history of harassing and stalking women and matches surveillance footage from the scene.[2] No mention is made

---

[1] See https://www.reuters.com/article/world/fact-check-false-data-on-us-racial-murder-rates-idUSKCN24I29S.
[2] https://www.documentcloud.org/documents/23820675-zion-william-teasley-probable-cause-afffidavit-and-indictment/.

of any racial or gender orientation involvement whatsoever, other than the fact he had internal struggle with his own sexuality… "as a Christian." Police note Teasley said he was concerned for his "salvation of his soul due to his thoughts." To some, Kirk regularly demeaned, debased and engaged in dangerous transphobic rhetoric, which they found abhorrent.

57.    Kirk also spoke against, "the decline of American men" and blamed it on the LGBTQ movement, including noting, America should "just take care of" transgender people, "the way we used to take care of things in the 1950s and 60s."

58.    In the 1950's and 1960's, transgender people faced abuse, beatings, forced psychological intervention, severe persecution through laws against cross-dressing, police harassment, employment discrimination and physical attack.

59.    Kirk told popular singer Taylor Swift and her NFL husband Travis Kelce, "Reject feminism. Submit to your husband, Taylor. You're not in charge."

60.    Kirk once discussed the use of the term, "Karen," which he called a, "slur," noting, "liberal women are awful, they're trying to get us to accept disgusting behavior by exploiting our distaste for a subtype of white liberal woman. And they also just want to start a race war. The left would love to see a race war."[3]

---

[3] May 19, 2023 The Charlie Kirk Show. See https://www.mediamatters.org/charlie-kirk/charlie-kirk-goes-unhinged-racist-rant-prowling-blacks-go-around-fun-go-target-white.

61.    This very view has been adopted by Turning Point and Kirk supporters, as well as Moms for Liberty supporters to justify white liberal women as evil, harmful to children and to be blamed for violence and the degradation of Christian values. It became and continued to be increasingly dangerous.

62.    Kirk juxtaposed his views and beliefs in Christianity with the need to hold those who believed or looked different as "less than," evil or enemies.

63.    About people of non-Christian faith, Kirk said, "Islam is not compatible with Western civilization." And, "Islam is the sword the left is using to slit the throat of America."

64.    Kirk also divided Americans further by political affiliation, saying things like, "The American Democrat party hates this country. They wanna see it collapse. They love it when America becomes less white."

65.    Kirk continuously called those who took stances in disagreement with him, "social media jihadis," an expression used in Islamic and Muslim traditions, which has come to be Americanized as an expression of war.

66.    Over and over, Kirk said people like Plaintiff or fellow suspended teacher, Hope McMath, wanted to start a war. After his death, some who disagreed with Kirk were publicly remembering these comments and memorializing Kirk in their own way, by rejecting the view that he was a UNIVERSAL national hero or in any way spoke for EVERYONE.

67.    Social media algorithms fed this poison to the masses on each side to generate profits over people. To some, Kirk was a Christian crusader who stood up for them. To others, Kirk was a symbol of white nationalism who persecuted those of different races, faiths, sexual orientation and beliefs. To all who felt strong in their beliefs, the pendulum of First Amendment was supposed to protect them.

68.    After his death, on September 12, 2025, clips of Kirk's own *bonafide* statements filled the internet, as people reposted his comments, such as, "blacks were better off under slavery."[4]

69.    Major news websites featured many of Kirk's soundbites on guns, race and more, as well has Kirk saying he wants to be remembered for the courage he had in his faith.[5]

70.    Dissent to Charlie Kirk, his teachings, his views and his opinions were never brought into the classroom by Ms. Bartlett in any way.

71.    Despite the harmful rhetoric, Bartlett never discussed any of her own political opinions in the classroom about Kirk, Turning Point, Mom for Liberty, Donald Trump, the Make America Great Again movement, immigration, transgender issues or any other subjective opinion about politics. She helped her kids survive and overcome disabilities.

---

[4] See https://www.instagram.com/reel/DOcqXWzDMHn/?hl=en.
[5] https://www.instagram.com/reel/DOeymDdFXQ7/.

72.    Ms. Bartlett assuredly does not want to start any war, particularly a race war, but personally rejected Mr. Kirk's rhetoric.

73.    Ms. Bartlett knows no one who wants to start a "race war" or any type of war between fellow humans. She is not an enemy, not awful and has lived a purpose filled life standing up for herself and others.

74.    Private and public officials universally started shaming, doxxing and then seeking to end the jobs, if not lives, of dissenting voices, including Bartlett.

75.    Death threats have caused people, including educators, to further go in hiding.

76.    Many of those individuals, including a vast number of educators, were immediately persecuted, shamed, doxed and punished solely due to the content of their opposing speech.

77.    In some instances, educator's names were added to a website called, "Charlie's Murderers." The original website was on a .com domain and was removed. A resurrected version now exists on a .net domain. The domain literally listed people's contact information and employers for others to contact and complain. It is unknown if Plaintiff was listed.



78.    Meanwhile, Charlie Kirk always encouraged speech of all types and vociferously maintained speech should not be censured or persecuted by the government. On May 2, 2024, Kirk posted to the social media platform, "X" (formally known as Twitter), as follows, "Hate speech does not exist legally in America. There's ugly speech. There's gross speech. There's evil speech. And ALL of it is protected by the First Amendment. Keep America Free."



## DUVAL COUNTY PUBLIC SCHOOLS

79.    Duval County Public Schools (hereinafter "DCPS" or "Duval Schools") oversees over 100,000 students in and around Jacksonville, Duval County, Florida.

80.    Approximately 42% of those students are African American. 8% are Hispanic, 12% are identified as other and 29% are identified as "white."

81.    These students are spread across approximately 208 schools.

82.    In recent years, the Jacksonville Public Education Fund and DCPS noted, "In an analysis of three years of data from the school district, Jacksonville Public Education Fund revealed that Duval County's teacher retention rate is about 84 percent year-to-year across the entire district and about 75 percent year-to-year in the average school."[6]

83.    The study also noted, "statistics show that in Jacksonville, Black teachers make up about 29 percent of total teachers while Black students make up about 45 percent of total students. And Black male teachers make up less than 6 percent of the teacher workforce."[7]

84.    Duval County Public Schools is led by a seven-member board.

---

[6] https://eu.jacksonville.com/story/news/education/2021/02/23/new-research-highlights-teacher-retention-inequity-duval-schools/4556199001/
[7] Id.

85.    The majority (four) of those seven members are members of, made a pledge to, or were endorsed by Moms for Liberty.

86.    Moms for Liberty was founded in 2020 by conservative women in Florida and has quickly expanded its presence across the country.

87.    Moms for Liberty landed national media attention for its efforts — sometimes successful — to fight COVID safety measures in schools, ban books, limit discussion about race and LGBTQ identities and populate local school boards with conservatives.

88.    The Southern Poverty Law Center ("SPLC") placed Moms for Liberty on its list of anti-government extremist entities, drawing comparisons between them and parent groups that attempted to re-segregate public schools during the civil rights movement. "They really are seeking to undermine public education holistically and to divide communities," said Rachel Carroll Rivas, deputy director for research, reporting and analysis at the SPLC.[8]

89.    In many ways, Turning Point and Moms For Liberty share platforms, agenda and aggressive intent to restore and reshape schools, and American society based on their shared beliefs.

---

[8] https://www.npr.org/2023/06/07/1180486760/splc-moms-for-liberty-extremist-group

90.    In fact, upon the death of Kirk, Moms For Liberty's co-founder noted, "The work we are called to do at Moms for Liberty is the same work that Charlie Kirk and our friends at Turning Point USA have poured their lives into for more than a decade. We have always been united in this purpose and mission: to preserve America for future generations."[9]

91.    Moms For Liberty further noted, "Evil showed up to battle yesterday. But evil **WILL NOT WIN** this war. **Put on your armor, moms!** Stand with courage and love. Fasten your belt of truth and the breastplate of righteousness. These are the tools we will use to overcome it." (emphasis in original). Id.

92.    Indeed, Moms For Liberty consistently uses / used terms of war and division to case their believers as righteous and the other side as evil.

93.    At the DCPS school board meeting following Kirk's shooting, each and every one of those four endorsed members wore shirts emblazoned with, "This is the turning point."[10]

94.    These shirts were allegedly homemade, but features intellectual property of Turning Point USA, Inc., the very entity founded by Charlie Kirk.

95.    The chairwoman of the Duval County School Board Charlotte Joyce smiles displaying her shirt here:

---

[9] https://portal.momsforliberty.org/news/our-friend-charlie-kirk/
[10] https://www.firstcoastnews.com/article/news/local/duval-county-school-board-members-turning-point-usa-shirts-backlash/77-815d45ef-11dd-4a65-a755-fa61c3d7b81c



96.    Turning Point USA, Inc., also has sought trademarks for, "PLAYING OFFENSE TO WIN THE CULTURE WAR," "A BATTLE TANK, NOT A THINK TANK, "HEALING A SICK CULTURE," and, "WE ARE DOING THE WORK TO SAVE AMERICA." Like Moms For Liberty, Kirk and his TPUSA organizations consistently use / used terms of war and division to case their believers as righteous and the other side as evil.

97.    By no means are these universal, apolitical or unitary taglines. They are intentionally divisive phrases based around one side claiming a moral high ground while insisting the other is starting a war, is immoral and full of sin.

98.    At the school board meeting on October 7, 2025, Ms. Joyce claimed these shirts were pink in honor of cancer. She failed to acknowledge the clear promotion of "Turning Point" until she was questioned about it during public comment, over an hour into the meeting.

99.    The October 7, 2025 school board meeting had 76 speakers requesting to be heard. Because of the vast number of applicants, <u>each was limited to one minute.</u>

100.    The speakers continued the tone of division and ridicule of speech they did not agree with:

a.    One of the first speakers, Josh Nathanson, praised the Board leadership, accused the minority members of the board of misconduct and asked, "How did this person (referring to Hope McMath) get hired?" and, "Is a teacher excusing an assassination as karma fit to teach in our schools." Nathanson and/or his spouse are Moms for Liberty members and campaign for their platform in a school board race.

b.    A few speakers later, Blake Harper, brought up that he plans to exercise his "Constitutional Right of Individual Speech." Mr. Harper notes, "when you are employed by a company, you accept their rules and regulations. You don't get to make your own. And that is exactly what Hope McMath thinks she can do."

c.    Michele Matisue noted her husband was a military test pilot and a leader and a teacher must also similarly exercise discipline and leadership, saying, "if a teacher is going to make very incendiary comments, and things that are dangerous, and students are affected by that, that is something to consider as to whether that person should be leading children when their minds and education are

21

malleable and they are learning. So, I appreciate you taking a thorough investigation and I am praying for each one of you as you make this decision."

d.    Joey Marmo started with, "What if I came up here and started making threats? What would happen to me?" And, added, "Think about how callous, cold hearted and empty you must be to wish ill and death upon another human being. That's not free speech, that is bloodless murder." Mr. Marmo noted the $30,000 a year in taxes he pays, "to fund these animals teaching our children." And, "I want these sick lefty sickos defending this teacher to be reminded Charlie (Kirk) was a father…." And, "The biggest crime to me is sickos like this teacher keeping her job after making sick deranged comments regarding the death of Charlie Kirk." He then quotes Jesus, says, "I am Charlie Kirk" and "fire her."

e.    James Crundon says he is "all for free speech," but then says if someone says something, "as out of step as this is… they don't need to be teaching children."

f.    Gordon Terry resumed the persecution of Ms. McMath by reading scripture and called those on the other side of him, "evil folk." Mr. Terry is known for placing political signs for staunch Republican candidates.

g.    Natalie Dryer said she spoke "on behalf of Moms for Liberty." She said parents thank them for "exposing the District's secret gender transition plans." She

referred to McMath's speech as "vile" and claimed Moms for Liberty could help solve the District's enrollment decline.

101.    As speakers went on, those who shared the Turning Point views received warmer receptions by the Board than those who expressed concerns. They were thanked and welcomed. Counterpoints were more rudely treated. It got to the point only those with pro Turning Point / Moms for Liberty or anti Hope McMath comments were routinely warmly thanked while others opposing those views were ignored as they left.

102.    Pro Turning Point / Moms for Liberty speakers were more commonly allowed to finish thoughts, but those opposing their views were abruptly cut off.

103.    At the October 7, 2025 school board meeting, each speaker was limited to one minute. Some met hostility, and even removal, if they exceeded 60 seconds. Each also was required to give their name and address.

104.    However, at the end of the meeting, April Carney read one sole email she selected, justifying the reading of the email falsely saying only "one voice" was often heard at meetings.

105.    However, dozens of voices were heard, expressing plenty of views on both sides. This stigma sought to chill speech through rhetoric and falsehood.

106.   Unlike every speaker who had to reveal their name and address, April Carney kept the name (and address) on the email secret. The secret e-mail was not introduced into the record.

107.   April Carney further broke the rules the body instituted along with the First Amendment rights of each speaker when she boosted her own political views above others with an email she read from the unnamed person from 4:28.18 to 4:34.28- over 6 minutes without interruption.

108.   Even though the Board did not have Bartlett's fellow educator Hope McMath on any agenda, April Carney read the email with passion and emphasis, discussing how McMath was "excusing murder as karma," raised questions about McMath's mental health, insisted there were "red flags" prior to hiring McMath, claimed McMath handed out "blasphemous posters to District students," claimed McMath had "obvious lack of professional judgment," accused McMath of mocking children's religion, appealed to the superintendent that he must be "blown away" by McMath's actions, and otherwise excoriated McMath. These expressions cause Bartlett to be even more afraid for her livelihood and constitutional rights.

109.   Carney then blamed public commentary and debate in School Board meetings for "so much political violence" in schools. She said, "this parent" speaks for thousands, but claims they "only hear one side."

24

110.    Carney concluded her closing argument taking about people "celebrating murder." This shows clear and imminent bias to Bartlett, McMath and any teacher or administrator daring to disagree.

111.    Ms. Bartlett considers these threats and the issues surrounding how the school board to be more than chilling. She fears retribution and certainly does not trust these "leaders" standing in judgment of her First Amendment right to simply repost a tiktok video.

112.    Carney demonstrated direct selective enforcement and led a clear violation of the Board's own rules against speakers and also stigmatized speech and accused speakers of causing "violence" in schools.

113.    Other educators and students are taking note and their speech is being chilled by such an openly biased -and even angry- display by school board leadership.

114.    DCPS School Board Chairperson Charlotte Joyce also took time at the end of the meeting to memorialize Charlie Kirk. She noted that as she was watching his memorial, she wanted "to do something to remember Kirk." She noted she could have just used the word, "Freedom," but specifically chose, "This is the Turning Point."

## GOOSE VERSUS GANDER: INCONSISTENCY ABOUNDS AT DCPS

115.   Defendant seems focused on censuring speech which does not meet their leadership's or their donor's political agenda.

116.   Ms. [Name redacted] is an active teacher at Duval County Public Schools, who has received numerous complaints and a mere internal reassignment at her school. [Name redacted] has not received the same punishment for far right-sided speech as some have for simply re-posting left leaning speech, such as Plaintiff.

117.   [Name redacted] has not spent the last several months alone in a room awaiting a scintilla of due process.

118.   Instead, according to the Duval Schools website, Ms. [Name redacted] continues to teach science at [Name redacted]. Her public Instagram page notes she is a "DCPS Chemistry teacher."

119.   Ms. [Name redacted] has a publicly available presence on Core, the Duval court system's public records database. In 2016, Ms. [Name redacted] had a final judgment entered against her for protection against stalking. In the injunction, Ms. [Name redacted] was noted to make "obscene hand gestures" to someone's surveillance cameras and use her great dane to harass a neighbor despite a final injunction.

120.   On her previously publicly available Instagram, Ms. [Name redacted] posted proudly about her religion, mocked people who wore masks to prevent COVID and posted support for Donald Trump, saying, "God has Blessed America."

121.   Based on her own situation, Ms. Bartlett is confused about the vague standards of investigation and discipline under the First Amendment at DCPS.

122.   In one post, Ms. [Name redacted] posted a photo of a hat, which refers to Donald Trump and says, "Re-Elect that motherfucker." This is more offensive than anything shared by Plaintiff.



123. Ms. [Name redacted] also posted a xenophobic meme about an association between migrants and murder. This is more likely to harm and insult DCPS students and parents more than anything shared by Plaintiff.



124.   Ms. [Name redacted] has also posted a parody of "gender neutral tampons," noting they are "non-binary." This is more offensive and harmful than anything shared by Plaintiff.



125.    In another post, Ms. [Name redacted] makes a joke about the Snuggle Fabric Softner bear becoming a drug user. This is more offensive than anything shared by Plaintiff.



126.    Many of the students at [Name redacted] are immigrants, minorities and/or simply trying to get an education. Where is the line? It's clearly content biased as enforced.

127.    Making matters more concerning, students have indicated to school and/or district leadership that [Name redacted] has referenced political and religious views in the classroom, but she has not received equal treatment from Defendant DCPS or its agents.

128.    Ms. Bartlett is left alone to spend 8 hours per day, 5 days per week away from students for simply reposting non-inflammatory speech, while other teachers

can be left alone to start up Turning Point USA or Club America clubs to further share that viewpoint.

129. For instance, [Name redacted] is identified as a "Gifted" teacher at [Name Redacted] High School.

130. On her LinkedIn profile, [Name redacted] holds herself out as a, "Gifted Lead Support at [Name redacted] High School/DCPS Endorsement Facilitator at Duval County Public Schools."

131. [Name redacted] further notes, she is, "Experienced Lead Facilitator with a demonstrated history of working in the education management industry. Skilled in Lesson Planning, Research, Tutoring, Curriculum Development, and Teacher Training. Strong support professional with a Specialist degree and PhD program focused in Administration; Educational Research and Evaluation from University of Florida and UNF." [Name redacted] has been at DCPS for over 21 years.

132. [Name redacted] was recently very vocal on social media as there was a dispute about whether a "Turning Point" chapter should be started at [Name redacted] High School.

133. Publicly available posts on [Name redacted]'s social media quote far-right political groups and note rage against immigrants, "Black lives Matter," transgender people. In one post, [Name redacted] comments, "Time for Change!" to

a rage-bait article entitled, "Welfare Queen Brags About 'Raping The Government' Taunts Working Americans."

134.  [Name redacted] habitually attacks democrats and reposts articles and clearly false, rage inducing stories which [Name redacted] even admits are false.

135.  Alongside campaigning to be sponsor of a Turning point chapter, [Name redacted] noted, "The TRANS population are the ones who are riddled with hate. They are the ones who have lost their humanity."



136.   As noted above, [Name redacted] also accused the trans community of "fire bombings" and grooming children.

137.   [Name redacted] referenced "antifa" as "embracing anarchy" and attempting to "erase the rights of women."

138.   Saying any student or potential student of hers "lost their humanity," accusing entire groups of people of being murderers, and the actual instigation of turbulence at its schools has completely gone ignored by DCPS while simply resharing something about Charlie Kirk literally gets an educator indefinitely excommunicated.

139.   Plaintiff can go through thousands of teachers and show equally offensive posts, reposts and private conversations. All equally must be protected or not protected at all- the U.S. Constitution and Bill or Rights are not malleable.

## CAGGIANO VERSUS DUVAL COUNTY PUBLIC SCHOOLS

140.   Defendant is well aware of these issues and have been involved in adverse court rulings on more extreme First Amendment cases than this one.

141.   In 2022, Sandalwood High School math teacher, Thomas Caggiano, was suspended following what was referred to my media as, "problematic racist and anti-LGBTQ posts on Facebook."[11]

---

[11] https://www.jacksonville.com/story/news/education/2020/12/02/sandalwood-teacher-suspended-slew-transphobic-anti-lgbtq-facebook-posts-duval-county/3788872001/.

142.   While Plaintiff only reposted an innocuous video, Thomas Caggiano refused to use a transgender student's pronouns, lied and then doubled down with posts Plaintiff finds disturbing (albeit protected).

143.   Caggiano received inclusion training following the incident, but "continued to speak out against the transgender community and post memes about other marginalized groups."

144.   Caggiano was further accused of lying during the investigation and even accused media of hacking into his social media accounts as a defense.

145.   In his posts — which were often graphic or explicit — Caggiano shared memes disparaging marginalized groups, including photos showing a figure in a pink skirt with long blond hair standing in front of a urinal or making fun of transgender celebrities like Caitlyn Jenner. A post written by Caggiano himself (not shared from someone else) called transgender people seeking to use public restrooms that line up with their gender "insanity."

146.   In his defense, Caggiano said, "sharing my belief on my personal Facebook that there are only two genders that correspond with the biological sex is not 'phobia'" and said that memes are a way to make political statements with a "touch of humor," but "sometimes the humor is in the eye of the beholder."

147.   <u>Former students of Caggiano spoke with DCPS and said they "dreaded" going to his class</u> because of his in-class issues and felt "exhausted" daily because

of his <u>behavior in the classroom</u>. None of these comments have ever been made about Plaintiff.

148.   <u>One parent told DCPS investigators</u>, "From Mr. Caggiano's postings on Facebook, it is clear that he is <u>racist and hateful toward LGBTQ</u> individuals and as that racism caused and continues to cause immeasurable harm to anyone who is not white (not only physically, but also psychologically)." None of these comments have ever been made about Plaintiff.

149.   One parent told DCPS investigators, "From Mr. Caggiano's postings on Facebook, it is clear that he is racist and hateful toward LGBTQ individuals and as that racism caused and continues to cause immeasurable harm to anyone who is not white (not only physically, but also psychologically)."

150.   A prior version of the DCPS school board voted unanimously to deliver Caggiano a written reprimand and to suspend him for five-days unpaid in reaction to the report.

151.   On appeal, Caggiano argued that his suspension and reprimand violated his free speech rights. The court agreed, writing, "Turning to the law, the contours of teacher free speech are governed by the principles of *Pickering v. Board of Education*, 391 U.S. 563 (1968), and its progeny whose framework created a balance between the constitutional rights of a teacher who comments upon matters of public interest as a citizen and the government's interest in the efficient delivery of the

public educational services it provides through its teachers, administrators, and staff."

152.    And, "In Pickering, a teacher sent a letter that was critical of the school board's operations and budgetary decisions, which was published in the local newspaper. Id. at 564. Pickering was fired and a hearing was held, resulting in the board concluding that sufficient evidence existed to support his termination. Id. at 566−67. The Illinois state courts concluded that Pickering's letter was "detrimental to the best interests of the schools" and rejected the claim that his dismissal infringed upon his First Amendment rights to speak on a matter of public concern."

153.    The U.S. Supreme Court noted, "(T)he "problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

154.    The Caggiano Court wrote, "Because the two reposts involved a matter of public concern, the next question is whether they presented a risk to the School Board's interest in running an efficient workplace that is free of disruption. On this point, no evidence was presented that the two reposts had any meaningful impact on the School Board's operations or that they created any disruption." And, "The posts occurred outside of the school, on Caggiano's own time and computer, and

amounted to little more than harmless political chitchat; they collectively amounted to the proverbial hill of beans."

155.   To the extent it hasn't been clear, there is no evidence which has ever been presented or is known to Plaintiff that her reposts had any meaningful impact on the School Board's operations or that they created any disruption whatsoever.

156.   Despite the different content, lies and a far more sensation fact pattern, the state appellate court overseeing this very jurisdiction and school district, "REVERSED with instructions to strike suspension and reprimand from employment records and to reinstate pay and related benefits from time of suspension."

## ALLEGATIONS IN SUPPORT OF INJUNCTIVE RELIEF

157.   Plaintiff's free speech has been chilled now, and in the future, as she has been deprived of her very livelihood as a consequence of her speech.

158.   The First Amendment forbids the Defendant from unreasonably regulating speech or discriminating against speech on the basis of viewpoint during Board meetings. Although not referencing Plaintiff herein, but a different suspended teach who spoke out about Charlie Kirk, Defendant's bias was clear at a recent school board meeting by its elected leaders wearing Turning Point shirts, evoking Charlie Kirk as a martyr, restricting speech while disobeying those restrictions and accusing Plaintiff's fellow teacher McMath of wrongdoing, incitement and crimes.

159.    School Board members wearing the shirts supporting the opposing viewpoint even angrily accused those speaking to the counterpoint of being evil, causing violence in schools or otherwise stigmatizing some views while rewarding others with kindness, extra time and certainly not accusing them of crimes and wrongdoing.

160.    Unless the actions, policies, and practices of Defendant are enjoined by this Court, Plaintiff will suffer the continuing loss of her constitutional rights and Jacksonville's public schools will continue to be places of fear, suppression and aggression.

161.    Plaintiff has suffered irreparable injury and continues to suffer irreparable injury as a result of the Defendant's actions, policies, and practices.

162.    Plaintiff will continue to suffer the violation of her First Amendment rights unless and until she is restored to her employment and position at DCPS

163.    Plaintiff does not have a plain, adequate, or complete remedy to protect her constitutional rights and to redress the wrongs and illegal acts complained of, other than immediate and continuing injunctive relief.

164.    Plaintiff does not have any true or adequate remedy at law. Deprivation of rights guaranteed under the Constitution is an irreparable injury for purposes of injunctive relief. In cases involving the loss of First Amendment rights, such as in

this case, monetary damages are necessary and a step, but grossly inadequate. Money cannot remedy the level of partisan censorship going on.

165.   The public interest would be served by the granting of injunctive relief. In fact, the public interest is disserved by Defendant's actions, which interfere with the public's rights guaranteed under the First Amendment.

166.   In this instance, no one has alleged any specific harm caused by Plaintiff other than the hurt feelings or political weaponization of speech by Turning Point supporters or Moms for Liberty, a 501(c)(4), which brags about using the courts to enforce their will, specifically in part, because they have successfully gained control of a majority of certain School Boards, like the Defendant herein.

167.   A permanent injunction will preserve Plaintiff's civil rights and will minimize the need to award extensive compensatory damages.

168.   Defendant and Defendant's leadership should not be simultaneously speaking in an official in support of one side of protected speech while serving as prosecutors and persecutors of the other side of the same protected speech.

169.   Defendant and Defendant's leadership should not be wearing t-shirts in an official meeting in support of one side of protected speech while serving as prosecutors and persecutors of the other side of the same protected speech.

170.   Defendant and Defendant's leadership should not be reading e-mail in an official in support of one side of protected speech while disallowing the other side of the same time and ability to present their own protected speech.

171.   Defendant's objectively biased leadership should not be in any way voting or participating in Plaintiff's case, as they have shown bias against educators who espouse views which are counter to their own.

## DAMAGES AND ATTORNEY'S FEES

172.   Because of Defendant's actions, Plaintiff's First and Fourteenth Amendment rights have been violated and Plaintiff is faced with similar and repeated violations of her rights in the future.

173.   Plaintiff has suffered economic losses, including the lost income from employment she would have received but for her illegal and unconstitutional termination.

174.   Plaintiff has retained John Phillips and Phillips, Hunt & Walker, LLC, as her attorneys to represent her in this action.

175.   Defendants are obligated to pay Plaintiff's attorney's fees and costs pursuant to 42 U.S.C. § 1988.

176.   Section 1988 allows a prevailing party to recover "a reasonable attorney's fee as part of the costs," 42 U.S.C. § 1988(b). A plaintiff is a prevailing party when she is "awarded some relief on the merits" that "materially altered the

legal relationship between the parties." *Royal Palm Props., LLC v. Pink Palm Props., LLC*, 38 F.4th 1372, 1376 (11th Cir. 2022).

## COUNT I
## FIRST AMENDMENT VIOLATION – RETALIATION

177.   Plaintiff realleges the facts set forth in Paragraphs 1 through 163 and incorporates those facts into this Count by reference.

178.   This is an action for damages, declaratory relief and injunctive relief brought by the Plaintiff against each Defendant under this Court's general jurisdiction and pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983.

179.   Specifically, DCPS acted under the color of law to deprive Bartlett of her First Amendment Rights guaranteed by the U.S. Constitution.

180.   Bartlett's social media posts are purely public and purely protected speech.

181.   It is well established that public employees, including teachers, do not lose their First Amendment rights merely because of their occupation. *See e.g.*, *Pickering v. Board of Education*, 391 U.S. 563 (1968). Speech outside the scope of ordinary job duties is protected under the First Amendment, especially when it relates to a matter of public concern.

182.   Further, DCPS was well aware of the recent *Caggiano* ruling in this very District censuring this type of action. In fact, at the same meeting where

Defendant's leadership wore Turning Point shirts, they had to vote on fees related to Caggiano's case.

183.  Plaintiff is uncertain as to her rights and remedies following the suspension, discipline, reassignment and potential termination of her employment in apparent violation of the First Amendment to the United States Constitution.

184.  In simply reposting a political comment concerning the death of Mr. Kirk and other issues of public concern, Plaintiff "spoke" as a private citizen.

185.  Defendant took adverse action against Plaintiff — specifically to publicly shame her, suspend, discipline, reassign and potentially terminate her from employment.

186.  Defendant's actions directly deprived Plaintiff of her First Amendment rights.

187.  Defendant's adverse action was in direct response to Plaintiff's protected political speech.

188.  Plaintiff's personal and political posts were the motivating factors in Defendant's decisions to take retaliatory action against Plaintiff.

189.  Defendant's response to Plaintiff's expression was sufficient to deter a person of ordinary firmness from continuing to engage in expressive activity.

190.  Defendant's actions have chilled Plaintiff's speech.

191.  The actions taken by DCPS and the rules and policies on which such actions are purportedly based, directly violate Bartlett's First Amendment rights and chill the right to future expression. Such actions, rules, and polices, should be enjoined to prevent further irreparable injury and a further chilling effect on Bartlett and others.

192.  Defendant's actions were based on their own objections to the content of Plaintiff's speech and the particular viewpoint expressed, all in direct retaliation for Plaintiff's speech.

193.  Defendant's decision to discipline, shame and potentially terminate Plaintiff's employment was motivated by Defendant's opposition to Plaintiff's viewpoint, which the Defendant has repeatedly labeled as offensive and contrary to its "values."

194.  Plaintiff is likely to succeed on the merits of her claims.

195.  Plaintiff has suffered past and future economic losses, past and future non-economic losses, loss of ability to earn in the future, emotional and mental distress and other damages as a direct result of Defendant's actions.

WHEREFORE, Plaintiff prays for the following relief:

A.    That this Court enter a judgment declaring that the Defendant's decision to suspend and/or terminate Plaintiff's employment violated the First Amendment because it was content-based;

B.      That this Court enter a judgment declaring that Defendant's decisions to suspend and institute termination proceedings against Plaintiff's employment violated the First Amendment because it was viewpoint-based;

C.      That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her prior position and responsibilities;

D.      That this Court enter a preliminary and permanent injunction removing any and all references to discipline or wrongdoing from her employment file;

E.      That this Court enter a preliminary and permanent injunction forever enjoining Defendant and the various agents and employees of Defendants from disciplining Plaintiff in the future for posting the specific political statement at the center of this lawsuit in the exercise of her First Amendment rights;

F.      That this Court enter a judgment for benefits and losses sustained by Plaintiff;

G.      That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

H.      That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

I.      That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

J.    That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

## COUNT II
## FIRST AMENDMENT VIOLATION - CONTENT AND VIEWPOINT DISCRIMINATION

196.    Plaintiff realleges the facts set forth in Paragraphs 1 through 195 and incorporates those facts into this Count by reference.

197.    This is an action for damages, declaratory relief and injunctive relief brought by the Plaintiff against the Defendant under this Court's general jurisdiction and pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983.

198.    Plaintiff is uncertain as to her rights and remedies following the suspension, discipline, reassignment and potential termination of her employment in violation of the First Amendment to the United States Constitution.

199.    In reposting someone else's political comment concerning the death of Mr. Kirk and other issues of public concern, Plaintiff "spoke" as a private citizen.

200.    Defendant took adverse action against Plaintiff — specifically to publicly shame her, suspend, discipline, reassign and potentially terminate her from employment.

201.    Defendant's actions directly deprived Plaintiff of her First Amendment rights.

202.    Plaintiff's interest in speaking as a private citizen on matters of public

concern necessarily outweighs Defendant's interests in advancing content- or viewpoint-discrimination.

203.   Plaintiff's interest in speaking as a private citizen on matters of public concern outweighs Defendant's interest in content and viewpoint discrimination or imposing a heckler's veto in response to the content of Plaintiff's speech.

204.   Defendant shamed, suspended, reassigned and instituted termination proceedings against Plaintiff's employment because of Defendant's opposition to the content of Plaintiff's political statement, or because of public reactions to Plaintiff's message, or both.

205.   Defendant never asserted that Plaintiff's political speech would upset the orderly operations of the classroom, nor were such disruptions reasonably foreseeable given the limited publication of Plaintiff's private speech, the lack of knowledge by her co-workers or students, Plaintiff's position and job responsibilities, and the content of Plaintiff's speech.

206.   Plaintiff's speech did not, in fact, disrupt her classroom operations or harm anyone.

207.   Public reaction to speech is never a content-neutral basis for regulation. See *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992). A heckler's veto is a viewpoint-based limitation on expression and is impermissible under the First Amendment.

45

208. The First Amendment prohibits government officials from discriminating against speech "based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019); see also *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–30 (1995) (action taken against a speaker because of "its message" is viewpoint discrimination). Viewpoint discrimination is an "egregious form of content discrimination" and is "presumptively unconstitutional." *Rosenberger*, 515 U.S. at 829–30.

209. Defendant's decision to stigmatize, reassign, suspend and/or institute termination proceedings against Plaintiff's employment is the product of viewpoint discrimination and is in retaliation for Plaintiff's speech.

210. Defendant's decision to suspend and potentially terminate Plaintiff's employment was motivated by their own opposition to Plaintiff's viewpoint.

211. Plaintiff is likely to succeed on the merits of her claims.

212. Plaintiff has suffered past and future economic losses, past and future non-economic losses, loss of ability to earn in the future, emotional and mental distress and other damages as a direct result of Defendant's actions.

WHEREFORE, Plaintiff prays for the following relief:

A.    That this Court enter a judgment declaring that the Defendant's decision to suspend and/or terminate Plaintiff's employment violated the First Amendment because it was content-based;

B.     That this Court enter a judgment declaring that Defendant's decisions to suspend and institute termination proceedings against Plaintiff's employment violated the First Amendment because it was viewpoint-based;

C.     That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her prior position and responsibilities;

D.     That this Court enter a preliminary and permanent injunction removing any and all references to discipline or wrongdoing from her employment file;

E.     That this Court enter a preliminary and permanent injunction forever enjoining Defendant and the various agents and employees of Defendants from disciplining Plaintiff in the future for posting the specific political statement at the center of this lawsuit in the exercise of her First Amendment rights;

F.     That this Court enter a judgment for benefits and losses sustained by Plaintiff;

G.     That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

H.     That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

I.     That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

J.     That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

## COUNT III
## FLA. STAT. § 1003.4505 – PROTECTION OF SCHOOL SPEECH

213.   Plaintiff realleges the facts set forth in Paragraphs 1 through 195 and incorporates those facts into this Count by reference.

214.   In 2010, the Florida legislature enacted the statute regarding "Protection of School Speech," which states:

> *District school boards, administrative personnel, and instructional personnel are prohibited from taking affirmative action, including, but not limited to, the entry into any agreement, that infringes or waives the rights or freedoms afforded to instructional personnel, school staff, or students by the First Amendment to the United States Constitution, in the absence of the  express written consent of any individual whose constitutional rights would be impacted by such infringement or waiver.* Fla. Stat. § 1003.4505

215.   Plaintiff's freedom of speech was and continues to be infringed.

216.   Plaintiff further alleges that she was subject to affirmative action in that she was harassed, retaliated against and subjected to adverse action.

217.   Plaintiff seeks all remedies available at law and in equity under Fla. Stat. § 1003.4505.

218.   Plaintiff has suffered past and future economic losses, past and future non-economic losses, loss of ability to earn in the future, emotional and mental distress and other damages as a direct result of Defendant's actions.

WHEREFORE, Plaintiff prays for the following relief:

A.    That this Court enter a judgment declaring that the Defendant's decision to suspend and/or terminate Plaintiff's employment violated the First Amendment because it was content-based;

B.    That this Court enter a judgment declaring that Defendant's decisions to suspend and institute termination proceedings against Plaintiff's employment violated the First Amendment because it was viewpoint-based;

C.    That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her prior position and responsibilities;

D.    That this Court enter a preliminary and permanent injunction removing any and all references to discipline or wrongdoing from her employment file;

E.    That this Court enter a preliminary and permanent injunction forever enjoining Defendant and the various agents and employees of Defendants from disciplining Plaintiff in the future for posting the specific political statement at the center of this lawsuit in the exercise of her First Amendment rights;

F.    That this Court enter a judgment for benefits and losses sustained by Plaintiff;

G.    That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

H.    That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

I.    That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

J.    That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

**COUNT IV**
**RIGHT OF FREE SPEECH,**
**U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983**

219.    Plaintiff realleges and incorporate by reference paragraphs 1 through 195.

220.    The First Amendment embodies "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

221.    The government may not silence speech because it criticizes government officials or employees, or their favorite ideas or initiatives, even if that speech does so in ways that many people may find unpleasant. Allegations of hurt feelings, real or specious, do not justify censorship of public speech.

222.    First Amendment protections extend to social media and out of classroom political opinions by educators.

223.    In this very jurisdiction, DCPS has been warned on the supremacy of the First Amendment. See *Caggiano v. Duval County Public Schools*, discussed above.

224.    By implementing and enforcing polices which as directly violative of Bartlett's rights, Defendants, under color of law, deprive Plaintiff of the right to free speech in violation of the First and Fourteenth Amendments to the United States Constitution.

225.    Accordingly, Plaintiff is damaged in violation of 42 U.S.C. § 1983, and, therefore, are entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendant's unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

226.    Plaintiff has suffered past and future economic losses, past and future non-economic losses, loss of ability to earn in the future, emotional and mental distress and other damages as a direct result of Defendant's actions.

WHEREFORE, Plaintiff prays for the following relief:

A.  That this Court enter a judgment declaring that the Defendant's decision to suspend and/or terminate Plaintiff's employment violated the First Amendment because it was content-based;

B.  That this Court enter a judgment declaring that Defendant's decisions to suspend and institute termination proceedings against Plaintiff's employment violated the First Amendment because it was viewpoint-based;

C.  That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her prior position and responsibilities;

D.  That this Court enter a preliminary and permanent injunction removing any and all references to discipline or wrongdoing from her employment file;

E.  That this Court enter a preliminary and permanent injunction forever enjoining Defendant and the various agents and employees of Defendants from disciplining Plaintiff in the future for posting the specific political statement at the center of this lawsuit in the exercise of her First Amendment rights;

F.  That this Court enter a judgment for benefits and losses sustained by Plaintiff;

G.  That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

H.     That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

I.     That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

J.     That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

### **JURY TRIAL DEMANDED**

WHEREFORE, Plaintiff, HALEY BARTLETT, demands a jury trial against Defendants, DUVAL COUNTY PUBLIC SCHOOLS.

Law Office of Phillips, Hunt & Walker

**/s/ John M. Phillips**
JOHN M. PHILLIPS, ESQUIRE
Florida Bar Number: 0477575

**/s/ William K. Walker**
WILLIAM WALKER, ESQUIRE
Florida Bar Number: 0085552
660 Park Street
Jacksonville, FL 32204
(904) 444-4444
(904)508-0683 (facsimile)
Attorneys for Plaintiff
jmp@floridajustice.com
william@floridajustice.com
anne@floridajustice.com